## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ALLIED TELECOM GROUP, LLC,

        *Plaintiff,*

      v.

DISTRICT OF COLUMBIA,

        *Defendant*.

Civil Action No. 1:22-cv-0653 (CJN)

### MEMORANDUM OPINION

Plaintiff Allied Telecom Group, LLC, a telecommunications service provider, alleges that, for the past ten years, the District of Columbia Public Schools has leveraged a provision of the District of Columbia Code to evade FCC regulations when purchasing federally-subsidized telecommunications services from its sister agency, the District of Columbia Office of the Chief Technology Officer. After the Court denied the District's motion to dismiss, the parties cross-moved for summary judgment. For the reasons explained below, the Court will grant the District's motion and deny Allied's.

I.    **Background**

    A.    **Statutory Framework**

This case centers on an FCC subsidy program called "E-Rate," which "entitles qualifying schools and libraries to receive Internet and telephone services at discounted rates." *U.S. ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 116–17 (D.C. Cir. 2015); *see also* 47 U.S.C. § 254(h)(1)(B). To participate in the program, which is funded by a fee that the Telecommunications Act of 1996 and the FCC's implementing regulations impose on interstate telecommunications carriers, a

1

school or library must first "conduct a fair and open competitive bidding process" with respect to the services that it seeks.  47 C.F.R. § 54.503(a); *AT&T*, 791 F.3d at 116–17.  Although the FCC's regulations do not specifically define what such a process must involve, they do contain "an illustrative list of activities or behaviors that would *not* result in a fair and open competitive bidding process."  47 C.F.R § 54.503(a) (emphasis added).  Those include, among others, when "the applicant's FCC Form 470"—the form used to solicit E-Rate bids—"does not describe the supported services with sufficient specificity to enable interested service providers to submit responsive bids"; when the service provider "participates in the bid evaluation or vendor selection process in any way," including by the school or library "turn[ing] over to a service provider the responsibility for ensuring a fair and open competitive bidding process"; and when "the applicant for supported services has a relationship with a service provider that would unfairly influence the outcome of a competition or would furnish the service provider with inside information."  *Id.*; *see also id.* § 54.503(c)(1).  Notwithstanding this last provision, however, the regulations expressly permit state government entities to bid to provide E-Rate services.  *See* 47 C.F.R §§ 54.519(a), (a)(6).

After the competitive bidding process is complete, a school or library that wishes to seek funding approval for E-Rate services must "carefully consider all bids submitted" and then "select the most cost-effective service offering."  *Id.* § 54.511(a).  Although price must be the "primary factor" in "determining which service offering is the most cost-effective," an applicant may also consider other "relevant factors."[1]  *Id.*  "Once the schools and libraries have reached an agreement

---

[1] In guidance provided on its website, the administrator of the E-Rate program advises applicants that "[o]ther relevant evaluation factors may include:  prior experience including past performance; personnel qualifications including technical excellence; management capability including schedule compliance; or environmental objectives."  *See* How to Construct an Evaluation, *Universal Service Administrative Co.*, https://www.usac.org/e-rate/applicant-

with a service provider, they can submit a request for funding approval," or a Form 471, "to the Universal Service Administrative Company [USAC]," the body responsible for administering the E-Rate program. *AT&T*, 791 F.3d at 117; *see also* 47 C.F.R. § 54.504(a). If USAC approves the agreement, it will "either reimburse the school or library for its payments to the service provider, or will pay the service provider's invoices directly." *AT&T*, 791 F.3d at 117; *see also* 47 C.F.R. §§ 54.514(a), (c).

Participants in the E-Rate program are subject to audits of their compliance with its requirements; failure to abide by them, including the obligation to conduct competitive bidding, can result in the forfeiture of disbursed funds. 47 C.F.R. §§ 54.504(a)(1)(vi), 54.516(c). State law also guards against anticompetitive conduct in the administration of the E-Rate program because E-Rate "competitive bid requirements apply in addition to state and local competitive bid requirements and are not intended to preempt" them. *Id.* § 54.503(b). However, any applicable state regulations must be "not inconsistent with the [FCC's] rules to preserve and advance universal [telecommunications] services," and cannot "burden Federal universal service support mechanisms." 47 U.S.C. § 254(f).

### B.    Factual Background

Before 2015, the District of Columbia Public Schools (DCPS) received its telecommunications services from Allied Telecom. ECF No. 27-1 ¶ 21. In January 2015, however, DCPS submitted Form 470s to USAC, indicating its intent to issue solicitations for Internet and Wide Area Network (WAN) services that could be subsidized by E-Rate.[2] ECF No.

---

process/selecting-service-providers/how-to-construct-an-evaluation/ (last accessed January 31, 2025).

[2] Although "[t]he District's document production did not include the Form 470 application that DCPS would have filed for work related to the internet access services," ECF No. 36-1 (Allied

36-2 ¶ 22; ECF No. 35-2 at 2.  Shortly afterward, DCPS issued the promised solicitations—long, detailed documents describing the specifications of the Internet and WAN services it sought.  *See* ECF No. 35-3; ECF No. 35-4.

A few days later, DCPS representatives exchanged emails with representatives from the District's Office of the Chief Technology Officer (OCTO) regarding the substance of DCPS's request for WAN services.  *See* ECF No. 36-3.  DCPS asked OCTO to "assist [it] in establishing clarity . . . around the terms and conditions [of the solicitation] that may impact vendors submitting [] appropriate and reasonable . . . bids/proposals which will allow DCPS to receive ERATE reimbursement . . . ."  *Id.* at 1464.  DCPS and OCTO also discussed how the WAN awardee would compensate OCTO for the use of its existing network infrastructure, with OCTO ultimately providing DCPS its pricing schedule and informing DCPS that it "is able to provide E-Rate eligible services . . . as a prime bidder directly . . . or . . . as a subcontractor to another prime bidder."  *Id.* at 1456, 1460–61.

Following these discussions, DCPS amended both its Internet and WAN solicitations to require offerors to submit alongside their proposals "any subcontracting plan required by law."  ECF No. 35-6 at 14; ECF No. 35-7 at 116.  DCPS did not, however, provide prospective bidders with the pricing scheme it received from OCTO—despite recognizing internally that, if vendors do not know OCTO's "monthly recurring charges," "[it is] not clear how they can submit a technical and price proposal which [DCPS] can evaluate objectively and effectively."  ECF No. ECF No. 36-3 at 1457; ECF No. 35-6; ECF No. 35-7.  DCPS also considered "amend[ing] the solicitation[s] to direct the vendors to reach out to [OCTO] or any other stakeholder in OCTO to

---

Reply) at 9 n.6, the parties do not appear to dispute that the District did file two separate Form 470s for WAN and Internet services.  *See id.*; *see also* ECF No. 35-7 at 106 (referring to Internet Form 470).

discuss the current infrastructure," but ultimately decided against it on the basis that "DCPS . . .
has to control and manage all discussions and communication . . . until the award of a contract."
ECF No. 36-3 at 1465.

A few days later, DCPS filed a new Form 470 that covered both WAN and Internet
services. ECF No. 35-5 at 3. In this Form 470, DCPS indicated that it did *not* intend to release a
more-detailed solicitation for either of the services, and included only a one-line description of the
"[q]uantity and/or [c]apacity" of the requested services. *Id.* And the next day, DCPS cancelled
the Internet and WAN solicitations that it had issued pursuant to its first two Form 470s, explaining
that, "due to [] changes in the specifications and requirements of the Division of Technology
Initiatives within the Office of the Deputy Chancellor for Operations," it had decided to seek
"[an]other procurement method to adequately meet the needs of the Agency." ECF No. 35-19 at
2; ECF No. 35-20 at 2. However, because DCPS's second Form 470 remained live, service
providers could still respond to DCPS's WAN and Internet connectivity services request—albeit
without the detailed information "outlining the scope, requirements, and terms of the services
request" that the cancelled solicitations had contained. ECF No. 36-2 ¶ 22; *see also* ECF No. 35-
5; 47 C.F.R. § 54.503(c)(1).

Both Allied and OCTO submitted bids in response to the request—no other providers did—
and Allied's proposal was approximately 2% cheaper than OCTO's. ECF No. 27-1 ¶¶ 3, 24; ECF
No. 36-2 ¶ 24. Nevertheless, DCPS awarded the bid to OCTO, executing a "Memorandum of
Understanding" (MOU) that committed it to purchase one year of WAN and Internet connectivity
from OCTO with the option to extend. ECF No. 26-3 at 1247; ECF No. 27-1 ¶ 2. Importantly,
the MOU stated that its "legal authority" was D.C. Code §§ 1-301.01(k), a provision of District
law providing that

> [t]he Mayor may authorize the heads of District departments, offices, and agencies to place orders with any other department, office, or agency of the District for materials, supplies, equipment, work, or services of any kind that the requisitioned department, office, or agency may be in a position to supply or equipped to render.

ECF No. 26-3 at 1246. The same day, DCPS submitted a Form 471 to USAC, "certify[ing] that all bids submitted were carefully considered and the most cost-effective service offering was selected, with price being the primary factor considered . . . ." ECF No. 35-8 at 1309. Although the MOU was worth more than $1 million, and although District law requires government contracts in excess of that amount to be approved by the District's Council, *see* D.C. Code § 1-204.51(b)(1), the record does not reflect that the MOU was submitted to or approved by the Council. *See* Allied Reply at 3.

Shortly afterward, Allied's chairman, Ken Williams, emailed DCPS to "express [] concern over DCPS's recent award of WAN and Internet services to [OCTO]." ECF No. 35-12 at 3. He opined that "the award to [OCTO] at a higher price may be in error and outside of DC Procurement regulations as well as E-rate fair and competitive bidding requirements," and asked DCPS to "please explain how the award was made to [OCTO] at a higher price, including the contract vehicle used." *Id.* After DCPS concluded in internal emails that its agreement with OCTO was not an "actual contract" but instead "an MOU," DCPS informed Mr. Williams that, "[b]ased on an analysis of the responses DCPS received to the Form 470, the Chancellor has decided it is in the best interest of DCPS to enter into an MOU with [OCTO] to provide these services." ECF No. 35-18; ECF No. 36-9 at 1293; ECF No. 36-10 at 1255. DCPS further asserted that "DCPS may enter into an MOU with [OCTO] according to D.C. Official Code § 1-301.01(k), which provides legal authorization for DCPS to place an order for these services . . . ." ECF No. 35-18.

The 2015 MOU authorized DCPS to "increase the number of service units," i.e., locations, "covered by th[e] MOU (and by extension increase the total cost for services under th[e] MOU)

by executing an addendum any time prior to the expiration of [its] term . . . ."  ECF No. 26-3 at

1247.  But the MOU did not authorize the use of an addendum for other types of service changes,

such as an upgrade in internet bandwidth.  *Id.*  Thus, as an E-Rate Compliance Analyst informed

DCPS in 2016, "if the bandwidth speeds or costs are increasing above the [limit in the 2015 MOU]

. . . the services will need to be rebid, to be in compliance with E-rate program rules."  ECF No.

36-5 at 2075.  Yet, when DCPS exercised its second option to extend the 2015 MOU, it

"upgrade[d] [its] gateway to 10 [GB per second] from 3 [GB per second] and the [WAN] access

of 97 schools (all of the sites with the infrastructure to handle the speed) from 100 [MB per second]

to 1 [GB per second]."  ECF No. 35-10 at 1036.  This change increased DCPS's total service costs

by $1.3 million, causing them to exceed the maximum cost outlined in the 2015 MOU.  *Id.* at 1037;

ECF No. 36-2 ¶ 25.

      After exercising its remaining options under the 2015 MOU, DCPS in 2019 again

submitted a Form 470 soliciting bids for Internet and WAN services to be provided in a one-year

contract with four additional option years.  ECF No. 27-1 ¶ 29; ECF No. 35-13.  Allied and OCTO

were again the only bidders, and DCPS again awarded the bid to OCTO through an MOU that

cited D.C. Code § 1-301.01(k) as its "legal authority."  ECF No. 26-6 at 372; ECF No. 36-2 ¶¶ 29–

30.  Although the 2019 MOU stated that total service costs "shall not exceed [$4.14 million],"

DCPS in both 2020 and 2021 exercised options that increased its costs to $4.18 and $4.29 million,

respectively.  ECF No. 26-6 at 373; ECF No. 25-14 at 903; ECF No. 25-15 at 896 –97; ECF No.

36-2 ¶ 30.

      DCPS solicited another E-Rate contract for WAN and Internet services in 2024, and OCTO

was the only bidder.  *See* Allied Reply at 24.

## C.    Procedural History

Allied filed this lawsuit against the District in 2022, arguing that DCPS had improperly "invo[ked] [] D.C. Code Ann. § 1-301.01(k) to justify a non-competitive, higher priced award of work to OCTO rather than awarding the work on a competitive basis," as FCC regulations require. ECF No. 1 (Compl.) ¶ 16.  Allied accordingly sought a "declaratory judgment that federal law preempts [] § 1-301.01(k) as it applies to contracts awarded under the E-rate program," such that "DCPS has no power to continue to contract with OCTO under the E-rate program."  *Id.* at 7. Allied also sought an injunction that would prevent DCPS from "using [] § 1-301.01(k) as a basis for an award to OCTO under the E-Rate program" and "requir[e] DCPS to terminate its current contract with OCTO under the E-Rate program."  *Id.*

The District moved to dismiss, primarily for lack of subject matter jurisdiction but also for failure to state a claim.  ECF No. 8.  In a memorandum opinion, the Court denied the motion.  ECF No. 14; ECF No. 15.  The Court explained that this case "presents a federal question" because "Allied's claims turn on the preemptive effect of federal law—the Telecommunications Act and the FCC's implementing regulations."  ECF No. 14 at 5.  Addressing "the substance of Allied's preemption-based claim," the Court acknowledged that, while § 1-301.01(k) does not clash with federal law in a way that makes complying with both "impossible," Allied's "core" theory was that § 1-301.01(k) is preempted "*as applied* to authoriz[ing] DCPS's contract with OCTO for E-Rate services."  *Id.* at 7 (emphasis added).  The Court then concluded that, at the pleading stage, Allied's allegations that DCPS "[pre]determined to obtain [WAN and Internet] services from OCTO" raised a "reasonable inference" that DCPS was deploying § 1-301.01(k) to authorize E-Rate reimbursement agreements in a manner that "violated the FCC's competitive-bidding rules." *Id.* at 8.

After the Court entered its Order, ECF No. 15, the parties proceeded to approximately six months of discovery and then cross-moved for summary judgment. *See* ECF No. 26 (Allied Mot.); ECF No. 27 (District Mot.).

## II.    Legal Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  To prevail on summary judgment, a moving party must show that the nonmoving party cannot "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.*  To avoid summary judgment, meanwhile, the non-moving party must establish that there is sufficient evidence to allow a reasonable jury to find in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient . . . ." *Id.*

## III.    Analysis

### A.    Mootness

The District argues that this case is moot because the 2015 and 2019 MOUs have now expired and Allied—despite asserting in its briefs that it "intends to continue to compete with OCTO for provision of the WAN and internet access services"—did not bid in DCPS's most recent contracting cycle.  *See* District Mot. at 14–15; Allied Reply at 41; ECF No. 40 (District Reply) at 13–14.  According to the District, this collection of facts means that Allied no longer has "a legally cognizable interest in the outcome" of this case.  *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979).

Yet, the burden of proving mootness is "heavy," and "falls with the party asserting a case is moot." *Maldonado v. D.C.*, 61 F.4th 1004, 1006 (D.C. Cir. 2023) (quotation marks omitted). To carry that burden, a party must demonstrate that "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur," and "(2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Davis*, 440 U.S. at 631 (cleaned up). The District has not done so.

Here, the alleged violation is the District's purported "use" of D.C. Code § 1-301.01(k) to "evade" the competitive-bidding requirements of the E-Rate program when purchasing telecommunications services from OCTO—a practice that Allied claims began in 2015 and remains ongoing. Compl. ¶¶ 1, 12; ECF No. 26-8 ¶ 2. There is no indication that this alleged violation will not recur: to the contrary, it appears undisputed that DCPS's current E-Rate agreement is with OCTO and was executed pursuant to § 1-301.01(k). *See* Allied Reply at 24; District Reply at 13–14. Nor did the expiration of the 2015 and 2019 MOUs and Allied's failure to compete in the 2024 contracting cycle "completely and irrevocably eradicate[] the effects of the alleged violation." *Davis*, 440 U.S. at 631. As Allied explained at oral argument, if DCPS is indeed leveraging § 1-301.01(k) to avoid conducting a competitive E-Rate bidding process, any 2024 bid by Allied would have been a "futile exercise." The Court will not decline to reach the merits of this case based on Allied's failure to bid in 2024 when, if Allied were to prevail on the merits, the implication would be that its 2024 bid would not have received fair consideration in the first place.

In short, Allied retains a "legally cognizable interest in the outcome" of this dispute. *Id.* Even assuming Allied can no longer obtain an injunction requiring DCPS to "terminate its current contract with OCTO," Compl. at 7, the remaining injunctive and declaratory relief Allied seeks

would prevent DCPS from relying on § 1-301.01(k) in future contracting cycles, permitting Allied—according to its theory of the case—to compete for E-Rate work on equal footing with OCTO and other District agencies. *See Ramer v. Saxbe*, 522 F.2d 695, 704 (D.C. Cir. 1975) ("A case is not moot so long as any single claim for relief remains viable . . . .").

To be sure, the District argues that Allied lacks standing to obtain that kind of purely prospective relief because Allied has "offere[d] no evidence to support that [it] intends to compete in future bidding processes." District Reply at 14. But the clear thrust of the record, as well as Allied's representations in its briefs and at oral argument, is that Allied *does* intend to compete in any DCPS bidding process that it believes could constitute a fair competition—and none that it does not. *See* ECF No. 27-2 (Deposition of Allied COO) at 12 (Allied was providing services before 2015 and bid for 2015 award); *id.* at 17–20 (Allied questioned propriety of 2015 award to OCTO); *id.* at 22 (Allied bid for 2019 award); *id.* at 24 ("since 2019," Allied's "understanding was that the government was using OCTO to provide [telecommunications] services"); *see also, e.g.*, Compl. ¶¶ 7, 12 (alleging that DCPS since 2015 has "prevented Allied from providing" services because it is "determined to obtain [them] from [OCTO]"). There thus exists a "substantial risk" that Allied will be unable to participate in DCPS's future contracting cycles in light of its asserted view that DCPS is deploying § 1-301.01(k) anticompetitively. *Jibril v. Mayorkas*, 20 F.4th 804, 814 (D.C. Cir. 2021) (describing when an "alleged future injury" "suffice[s] to establish standing"). That is enough: Allied need not pledge itself to make future bids that, by the terms of its lawsuit, would only amount to a waste of its time and money. *See Alvin Lou Media, Inc. v. FCC*, 571 F.3d 1, 6 (D.C. Cir. 2009) ("[A] bidder in a government auction has a right to a legally valid procurement process; a party allegedly deprived of this right asserts a cognizable injury.")

(quotation marks omitted); *see also* ECF No. 14 at 5–6 (concluding at the pleading stage that Allied

had standing as "a 'ready, willing, and able' bidder") (quoting *id.*).

### B.    Preemption Claim

At oral argument, Allied repeatedly confirmed that its claim in this case is not that the

District has directly violated the Telecommunications Act of 1996 or its implementing regulations.

Instead, Allied has reiterated, it is asserting a *preemption* claim grounded in federal common law.

*See* Allied Reply at 35–37.  Again, Allied's core contention is that the District, by relying on D.C.

Code § 1-301.01(k) to justify its award to OCTO of MOUs for E-Rate services, has deployed § 1-

301.01(k) in a manner that violates federal law—specifically, the competitive-bidding

requirements that apply to the E-Rate program.  *See* Allied Mot. at 4.  In Allied's view, that means

that, "as applied in the context of the E-Rate program, D.C. Code § 1-301.01(k) is preempted . . . ."

Allied Reply at 4–5.

Allied's "as-applied" preemption claim is effectively a conflict preemption claim.[3]  That

doctrine provides that a state law will be preempted when, "under the circumstances of the

particular case," it "stands as an obstacle to the accomplishment and execution of the full purposes

and objectives of Congress—whether that 'obstacle' goes by the name of conflicting; contrary to;

repugnance; difference; irreconcilability; inconsistency; violation; curtailment; interference, or the

---

[3] Allied briefly suggests that § 1-301.01(k) is expressly preempted by § 254(f) of the
Telecommunications Act of 1996, which "constrains state regulation by prohibiting regulations
inconsistent with FCC rules to preserve and advance universal service, . . . and providing that state
regulations shall not rely on or burden federal universal service support mechanisms."  *AT&T
Commc'ns, Inc. v. Eachus*, 174 F. Supp.2d 1119, 1123 (D. Or. 2001); Allied Mot. at 7.  Yet, Allied
does not argue that § 1-301.01(k) is facially "inconsistent with" the competitive bidding
requirements of the E-Rate program, or that, in the abstract, it "relies on or burdens" the regulatory
supports for the E-Rate program.  *See* Allied Mot. at 7.  Allied also does not defend its express
preemption theory in its reply.  *See generally* Allied Reply.  The Court will accordingly deem this
argument abandoned.  *See, e.g.*, *Wal-Mart Stores, Inc. v. Sec'y of Labor*, 406 F.3d 731 n.* (D.C.
Cir. 2005).

like." *Mozilla Corp. v. Fed. Commc'ns Comm'n*, 940 F.3d 1, 81 (D.C. Cir. 2019) (emphasis omitted). A conflict preemption analysis "entails two steps: first, identifying the purposes of the federal statute; and second, determining what, if any, obstacles are posed by the challenged state law." *Commissions Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321, 326 (D.C. Cir. 2014). But this analysis cannot involve "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives": "a high threshold must be met if a state law is to be preempted for conflicting with the purposes of" federal law. *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011).

The parties express no disagreement at step one of the analysis—nor could they reasonably do so. The stated purpose of the E-Rate program is to ensure that schools and libraries have access to "advanced telecommunications and information services" at "just, reasonable, and affordable rates." 47 U.S.C. §§ 254(b)(1)–(2), (6). And the competitive bidding rules that apply within E-Rate are expressly directed at the same goal. *See id.* § 254(h)(2)(A). By "ensur[ing] [that] eligible schools and libraries [are] informed of all available choices for services and [that] prices [] remain as low as possible," these regulations "allow[] for greater participation rates among eligible schools and libraries, given the limited availability of [federal] funds." *Hill v. F.C.C.*, 496 F. App'x 396, 398 (5th Cir. 2012) (citing 12 FCC Rcd. 8776 ¶ 480 (1997)).

Step two of the analysis is where the parties part ways. In an effort to establish that § 1-301.01(k) poses an obstacle to the pro-competitive purpose of the E-Rate regulations, Allied points to numerous allegedly anticompetitive behaviors surrounding DCPS's awards of the 2015 and 2019 MOUs to OCTO. Those are:

- After issuing its 2015 solicitations but before issuing the 2015 MOU, DCPS engaged in confidential discussions with OCTO about its WAN solicitation, such as asking OCTO for help "establishing clarity [as] to the issued solicitations around the terms

13

and conditions that may impact vendors submitting an appropriate and reasonable . . . bid[] . . . ." ECF No. 36-3 at 1464.

- Despite receiving OCTO's pricing schedule from OCTO during post-solicitation discussions, DCPS did not provide the schedule to prospective vendors when it amended its 2015 solicitations. ECF No. 36-3 at 1460–61; ECF No. 35-6; ECF No. 35-7.

- DCPS's second Form 470—which was the operative means by which service providers could submit a bid in 2015—contained "scant details about the terms and scope of the services to be provided." Allied Reply at 15; *see* ECF No. 35-5 at 3.

- Although Allied's 2015 bid was 2% lower than OCTO's, DCPS ultimately awarded the work to OCTO in a MOU that cited § 1-301.01(k) as its "legal authority." ECF No. 26-3 at 1246. Allied suggests that DCPS decided to award OCTO the work even *before* reviewing the bids, pointing to DCPS's statement when cancelling the initial solicitations that it intended to obtain the services through "[an]other procurement method"—i.e., in Allied's assessment, a MOU under § 1-301.01(k). Allied Reply at 14–15; *see also* ECF No. 35-19 at 2; ECF No. 35-20 at 2.

- The MOU was not approved by the District of Columbia Council despite exceeding the $1 million threshold for triggering the approval requirement, suggesting, according to Allied, that "the District itself did not treat the MOU with OCTO as a competitively awarded procurement contract."[4] Allied Reply at 17; *see also* D.C. Code § 1-204.51(b)(1).

- When DCPS exercised the second option of the 2015 MOU, it executed an addendum that increased the bandwidth—and thus the total cost of the MOU—despite the original MOU stating that bandwidth could not be changed via an addendum and would require a new bidding process. ECF No. 26-3 at 1247; ECF No. 35-10 at 1036.

- In 2019, after the 2015 MOU expired, DCPS again awarded OCTO its WAN and Internet work through a MOU that cited § 1-301.01(k) as its legal authority and contained four option years. ECF No. 26-6 at 372–373.

- Although the 2019 MOU laid out a maximum total cost, ECF No. 26-6 at 373, DCPS exceeded that cost when exercising options in both 2020 and 2021. ECF No. 25-14 at 903; ECF No. 25-15 at 896–97.

---

[4] Allied suggests that DCPS also violated the E-Rate regulations through its post-award communications with OCTO, because OCTO suggested to DCPS that, in order to cover the gap between the MOU set to begin in October 2015 and Allied's then-current contract, DCPS could "do an[other] MOU with [OCTO]." ECF No. 36-7; Allied Reply at 17. Yet, OCTO expressly noted that such an MOU would "not be E-Rate reimbursable," ECF No. 36-7, obviating any inference that OCTO was somehow improperly "participating in the . . . [E-Rate] vendor selection process." 47 C.F.R. § 54.503(a).

Allied argues that, through all of this conduct, DCPS violated the E-Rate regulations by improperly (1) establishing "a relationship with a service provider that would unfairly influence the outcome of a competition or would furnish the service provider with inside information" (via its pre-solicitation communications with OCTO); (2) "turn[ing] over to a service provider the responsibility for ensuring a fair and open competitive bidding process" (also via its pre-solicitation communications with OCTO); (3) failing to issue a Form 470 that "include[d], at a minimum . . . sufficient information to enable bidders to reasonably determine the needs of the applicant" (by issuing a barebones second Form 470 that was unaccompanied by solicitations); and (4) generally failing to engage in a "fair and open competitive bidding process" (by not providing OCTO's pricing schedule to all bidders, allegedly "pre-deciding" to award the bid to OCTO even at a higher price, failing to seek Council approval for the MOUs, and improperly modifying the MOUs through addenda rather than re-competition). 47 C.F.R. §§ 54.503(a), (c)(ii); *see* Allied Reply at 7–21, 22.

Yet, it is not at all clear how the District "used Code § 1-301.01(k)" to commit these purported violations—as Allied alleges and as is required for the success of its preemption claim. Allied Reply at 22; *see Mozilla*, 940 F.3d at 81. To start, many of the supposed improprieties that Allied points to occurred before DCPS ever invoked § 1-301.01(k) in issuing its MOUs, like DCPS's pre-solicitation communications with OCTO, its failure to provide Allied and other vendors with OCTO's pricing schedule, and its issuance of a supposedly deficient Form 470. Allied does not explain how any of these practices were facilitated by DCPS's later application of § 1-301.01(k)—a mere "provision allowing agencies to contract with one another," ECF No. 14 at 7—nor can the Court conceive of any possible link. Indeed, DCPS could have engaged in all of the same conduct (even if improper) and then still awarded the bid to Allied or another private

company—an award that would necessarily *not* have been made pursuant to § 1-301.01(k)'s grant of authority for inter-agency procurement agreements. That fact alone demonstrates that, whether or not DCPS in fact complied with E-Rate regulations governing the pre-solicitation and solicitation stages of the bidding process, its invocation of § 1-301.01(k) did not stand as an obstacle to its doing so.

To be sure, Allied also identifies alleged competitive bidding violations that it claims occurred later in the bidding process, both during and after DCPS's issuance of the MOUs pursuant to § 1-301.01(k). But these supposed violations still lack any clear nexus to § 1-301.01(k) itself— a provision that, to reiterate, simply allows and does not *require* District agencies to order goods and services from other District agencies (something that the E-Rate regulations also permit, *see* 47 C.F.R §§ 54.519(a), (a)(6)). Once again, Allied's "complaints about the bidding process and contracts"— its assertions that DCPS "pre-decided" to award work to OCTO, failed to pick the most cost-effective proposal, and then improperly utilized options to avoid recompeting the contract—"would be unchanged if DCPS issued the contract to OCTO under a different statutory authority or issued the award to a private contractor under the same circumstances." ECF No. 43 (District Surreply) at 6.

At oral argument, Allied contended that § 1-301.01(k) encourages anti-competitive conduct because it contains "no checks" on the kind of awards (or modifications to awards) that can be issued under its auspices. *Accord* Allied Mot. at 7 (arguing that § 1-301.01(k) "allows DCPS to place an order with OCTO *anytime*, even if the order to OCTO violates [f]ederal law"); Allied Reply at 36 (arguing that § 1-301.01(k) "encourages conduct or activity that results in higher price awards to [a] sister agency"). According to Allied, because orders placed pursuant to § 1-301.01(k) are not considered "contracts" in the way that agreements with private vendors are,

16

*see* Allied Reply at 38, they are exempt from the D.C. Code's requirement that certain major procurement contracts, including those worth more than $1 million, be approved by the D.C. Council. *See* D.C. Code § 1-204.51. They are also exempt, Allied claims, from the District's requirement that all *option* procurement contracts exceeding $1 million specifically account for any difference in the contract amount between the base period and the option periods. *See id.* § 2-352.02(a)(1), (c)(1A).

But even if true, this is beside the point. Whether or not District law imposes a lower threshold of regulation on intra-governmental procurement agreements than it does on procurement agreements with private vendors, nothing in District law prevents or discourages agencies like DCPS from complying with the perhaps highest-of-all threshold of regulation that applies under the E-Rate program—which is the only relevant question in a preemption claim. *See Fitzgerald v. Harris*, 549 F.3d 46, 53 (1st Cir. 2008) ("Conflict preemption is particularly difficult to show when the most that can be said about the state law is that the direction in which state law pushes behavior is in general tension with broad or abstract goals that may be attributed to federal laws.") (quotation marks, alterations, and ellipses omitted). In short, DCPS readily could (and perhaps did) simultaneously exercise its authority to order services from OCTO under § 1-301.01(k) while also complying fully with the E-Rate regulations. That is fatal to Allied's conflict preemption theory.

But this does not necessarily mean that Allied had no avenue through which to pursue what are, at bottom, allegations that DCPS failed in various respects to abide by the E-Rate regulations. Even assuming no private right of action exists under the Telecommunications Act of 1996 or the E-Rate regulations themselves (a question the Court does not address), the E-Rate regulations provide that, if any party is "aggrieved by an action taken by [USAC]"—the entity that

must approve any E-Rate reimbursement agreement—it may "seek review [first] from [USAC]" and then from the FCC.  47 C.F.R. § 54.719(a), (b); *see also id.* §§ 54.719(a), 54.705(a)(1)(iii) (specifying that an "action taken by [USAC]" includes "[a]dministration of the [E-Rate] application process, including activities to ensure compliance with [FCC] rules and regulations"). Notably, as part of this process, an entity may also challenge "prohibitive conduct on the part of a third party."  *Id.* § 54.721(d).  It thus appears at least possible that Allied could have sought and obtained administrative review of its objections to DCPS's E-Rate bidding process—i.e., its complaints of "prohibitive conduct" by a "third party."  And if Allied remained unsatisfied after exhausting those channels, it could then in theory have sought judicial review under the APA.[5] *See, e.g., Hill*, 496 Fed. App'x at 397, 401.

## IV.    Conclusion

For the foregoing reasons, the District's motion for summary judgment, ECF No. 27, is granted and Allied's motion for summary judgment, ECF No. 26, is denied.  An Order will accompany this Opinion.

Date:   February 3, 2025

_____
CARL J. NICHOLS
United States District Court Judge

---

[5] To the extent that Allied's underlying allegations include complaints that DCPS violated *the District's* procurement laws, *see, e.g.*, Allied Reply at 17 n. 16 (arguing that DCPS's 2015 operative Form 470 violated D.C. Code § 2-354.02(d) because it did not state whether the award would be "made on the basis of the lowest bid price"), Allied could have raised them before the District's Contract Appeals Board.  *See* D.C. Code § 2-360.03(a).  But such arguments would have been irrelevant to Allied's federal preemption claim.